UNITED STATES DISTRICT COURT              <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK

PEGGY MORRIS,

                                    Plaintiff,                    <u>MEMORANDUM</u>
                                                                  <u>AND ORDER</u>
              - versus -                                          12-CV-3959

THE CITY OF NEW YORK, et al.,

                                    Defendants.

APPEARANCES:

              JOSEPH N. OBIORA
                     146-03 Hillside Avenue, 2nd Fl.
                     Jamaica, NY 11435
              By:    Joseph N. Obiora
                     *Attorney for Plaintiff*

              CORPORATION COUNSEL OF THE CITY OF NEW YORK
                     100 Church Street
                     New York, NY 10007
              By:    Michael A. Cardozo
                     *Attorney for Defendants*

JOHN GLEESON, United States District Judge:

              Peggy Morris brings this action against the City of New York (the "City") and

several New York Police Department officers under 42 U.S.C. § 1983.  She alleges that the

officers are liable for false arrest, malicious prosecution and conducting an illegal search, and

that the City is liable based on its failure to properly train and supervise its officers.  These

claims stem from two incidents in which Morris was arrested, first on December 14, 2009, and

again on December 28, 2009.  Defendants have moved for summary judgment on all claims and

plaintiff has cross-moved for summary judgment on all claims except for unlawful search and

seizure.  For the reasons set forth below, defendants' motion is granted on all claims except for

the claim against Sergeant Edward Silvestre[1] for illegally searching her bedroom.  Plaintiff's

motion is denied.

BACKGROUND

A.  *Factual Background*

The following facts are taken from Local Rule 56.1 statements, affidavits,

deposition excerpts, and other documentary evidence submitted by the parties.  Each side has

moved for summary judgment.  Unless otherwise noted, these facts are either not in dispute or

are construed in the light most favorable to the party opposing the motion under consideration.

In December 2009, Morris lived in an apartment at 163-25 130th Avenue,

Jamaica, New York, with Osborne Miller.  Deposition of Peggy Morris ("Morris Dep.") Ex. 3 at

9:25-10:4.  Morris was not listed as a legal occupant of the premises on the income affidavit of

the apartment[2] but had resided there continuously as Osborne Miller's domestic partner since

2000.  *Id.* at 10:2-10.  In December 2009, Osborne Miller was terminally ill, incapacitated and

could speak only with great difficulty.  Second Am. Compl. ¶ 8.  He had two adult sons, Dave

and Eric Miller.  *Id* ¶ 9.  On the morning of December 14, 2009, Dave Miller used a key to enter

the apartment his father shared with Morris and searched through the contents of Morris's purse.

Ex. 3 at 33:13-25, 34:7-16, 40:15-20 (Morris Dep.).  Inside the purse Dave Miller found a Chase

bank card issued to Osborne Miller.[3]  *Id.* at 40:11-17.

Dave Miller went to the 113th Precinct and made a complaint to Police Officer

James Dameron, claiming that Morris had unlawful possession of the bank card and had made

---

[1]      I use the spelling set forth in the defendants' motion papers.  Silvestre's name is also spelled
"Silvestri" and "Silvester" elsewhere in the record.
[2]      An income affidavit is required by the New York City Housing Authority to determine eligibility
for Section 8 rental assistance and contains questions regarding who is a resident in a household.
[3]      There is some disagreement regarding whether the card in question was a debit card, an ATM card
or a credit card.  These distinctions are immaterial for the purposes of deciding the motion before me.

unauthorized withdrawals from the account associated with the card while Osborne Miller was incapacitated. Deposition of Officer Dameron ("Dameron Dep.") Ex. 5 at 8:9-10:16. Dave Miller asserted that he was an authorized user on the account but that Morris was not. *Id.* at 51:1-7. He also presented Dameron with the bank card in question, in the name of Osborne Miller, and explained that he had found it in Morris's purse. *Id.* at 10:4-16.

At around 7:00 P.M., Morris returned to the apartment and either Dave or Eric Miller called the police. Ex. 3 at 39:6-12 (Morris Dep.). Sergeant Edward Silvestre, along with two or three other unknown police officers, arrived at the apartment and were invited in by a locksmith who was changing the lock on the front door. They informed Morris they were there to investigate the complaint made against her by Dave Miller. *Id.* at 39:9-22; Second Am. Compl. ¶ 8. Once the police entered the apartment, Morris denied having used the card but the Miller brothers were "adamant" that she had. Deposition of Edward Silvestre ("Silvestre Dep."), Ex. 4 at 18:6-9. At this point, Morris's version of events differs from the defendants'. Morris claims that one or more of the police officers searched the bedroom she was in as well as her person, looking for Osborne Miller's mailbox key. Ex. 3 at 50:9 (Morris Dep.) ("They searched the bedroom."). Next, according to Morris, Silvestre asked Morris to accompany them to the precinct "to explain some things . . . ." Ex. 3 at 48:13-14 (Morris Dep.). When Morris asked if she was required to go, Morris claims that Silvestre replied "If you don't go voluntarily you will be arrested." *Id.* at 49:1-2.

Defendants insist, on the other hand, that no search of either Morris or her apartment was conducted and that Silvestre actually sent an officer to stop either Dave or Eric Miller from reentering the apartment to look for a mailbox key they wanted to obtain. Ex. 4 at 18:11-19:15 (Silvestre Dep.). According to defendants, Silvestre next asked Morris as well as

3

Eric and Dave Miller to accompany him to the precinct to further investigate the complaint

against Morris, but that no threat of arrest was made against Morris if she decided not to come.

*Id.* at 26:5-27:8.

It is undisputed that Morris was not handcuffed or formally arrested at the

apartment.  *See* Second Am. Compl. ¶ 9; Ex. 3 at 49:18-19, 55:25-56:3 (Morris Dep.).  At the

precinct, Dave Miller informed Dameron that between December 7, 2009, and December 13,

2009, six withdrawals, totaling $3,960, had been made from his father's Chase bank account.

Ex. C (Queens County Criminal Court Complaint dated 12/15/09) ("12/15/09 Criminal

Complaint").  All of these withdrawals had been made from an ATM machine located at 165-40

Baisley Boulevard in Jamaica, New York.  *Id.*  Dave Miller asserted that he was an authorized

user of the account but had been out of state during that time period, and that Osborne Miller, the

only other person authorized to access the account, was incapacitated due to his illness.  *Id.*  He

also informed Dameron that on or about December 5, 2009, a new debit card ending in 9715 was

issued in Osborne Miller's name for the account.  *Id.*  Dave Miller told Dameron that he believed

Morris had fraudulently caused the bank card to be issued and then had used the card to make the

unauthorized withdrawals.  *Id.*  The bank card he had found in Morris's purse and brought to

Dameron earlier that day ended in 9715.  *Id.*

Morris was asked by an unknown detective whether she would appear on the

surveillance video of the ATM machine withdrawing money with Osborne Miller's bank card, to

which she replied "Yes."  Ex. 3 at 56:3 (Morris Dep.).  Morris was then handcuffed to the wall

and placed under arrest by either the unknown detective or Dameron.  *Id.* at 56:20-57:24.

Dameron later fingerprinted Morris and prepared her arrest paperwork, charging her with

Criminal Possession of Stolen Property in the Fourth Degree, in violation of New York Penal

Law § 165.45.  Omniform System Arrest Report dated 12/14/2009, Ex. 2 ("Arrest Report

12/14/2009").  The District Attorney's office later added charges of First Degree Identity Theft

and Fourth Degree Grand Larceny.  Pl. Br. 9.  Morris was released on her own recognizance on

December 15, 2009.  Second Am. Compl. ¶ 20.  Osborne Miller passed away on December 16,

2009.  *Id.* ¶ 22.

After being released from custody, Morris attempted to regain access to the

apartment she had shared with Osborne Miller, but Dave and Eric Miller had changed the lock

and would not allow her to enter the premises.  Pl. Rule 56.1 Stmt. ¶ 36.  Morris commenced a

"lock-out proceeding" in the Queens County Housing Court, alleging that she had been forcibly

and unlawfully removed from the apartment.  Second Am. Compl. ¶ 21; Queens County Housing

Court Order, Ex. G ("Housing Court Order").  On December 18, 2009, an order was issued

granting Morris access to the apartment and directing Dave and Eric Miller to provide Morris

with the appropriate keys.  Ex. G (Housing Court Order).  The order also granted Dave and Eric

Miller "a right to unrestricted access to the apartment as representatives of the estate of Osborne

Miller."  *Id.*  On several occasions in December of 2009, Morris denied Dave and Eric Miller

access to the apartment.  Ex. 3 at 71:11-21 (Morris Dep.) ("[W]hen [Dave and Eric Miller] came

. . . I would never let them in.").

On December 28, 2009, Police Officers Kristyn Graziano and Rosa Jordan, as

well as two unnamed officers, arrived at the apartment along with Dave and Eric Miller.  *Id.* at

67:8-68:22.  Graziano showed a copy of the court order to Morris and explained that under the

order Morris was required to admit Dave and Eric Miller onto the premises as representatives of

their father's estate.  *Id.* at 69:1-4.  Morris again refused to grant the Miller brothers entry to the

apartment, claiming that the court order was "void" and that she was in the process of getting it

5

vacated.  *Id.* at 71:12-21.  Graziano and Jordan proceeded to arrest Morris on a charge of

Criminal Contempt of Court Order, in violation of New York Penal Law § 215.50.  Second Am.

Compl. ¶ 29.  Morris was released the next day and no charges were brought against her.  Ex. 3

at 76:19-20 (Morris Dep.).

        All counts against Morris stemming from her December 14, 2009, arrest were

dismissed on January 11, 2010, and the court order giving Dave and Eric Miller unrestricted

access to the apartment was vacated in March 2010.  Second Am. Compl. ¶ 26; Ex. 3 at 71:25

(Morris Dep.).

### B.  *Procedural Background*

        Morris commenced this action on August 2, 2012, alleging claims under 42

U.S.C. § 1983 for false arrest, malicious prosecution, and illegal search, as well as municipal

liability for failure to supervise and failure to train.  In her Second Amended Complaint, Morris

alleges false arrest and illegal search against Dameron and Silvestre based on her arrest on

December 14, 2009; malicious prosecution against Dameron stemming from the same arrest;

false arrest against Jordan and Graziano based on her December 28, 2009, arrest; and the above-

mentioned *Monell* claims against the City.[4]  On August 30, 2013, after discovery had concluded,

defendants moved for summary judgment on all claims and Morris cross-moved for summary

judgment on all claims except for the claim of illegal search and seizure by Silvestre.  I heard

oral argument on October 15, 2013.

### DISCUSSION

### A.  *The Summary Judgment Standard of Review*

---

[4]     Plaintiff's Second Amended Complaint also listed as defendants: Deputy Inspector Krystal
Johnson, Police Officer Johnny Hines, Police Officer Cassandra McKay Brown, Detective Sherman Pearson, 113th
Squad Detectives #1-6, 113th "John Doe" Police Officers #1-12, 113th "Jane Doe" Police Officers #1-6.  Morris
withdrew all claims against these defendants in her Memorandum in Opposition to Defendants' Motion for
Summary Judgment.

A party is entitled to summary judgment upon a showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if its resolution "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether material facts are in dispute all ambiguities are resolved and all inferences are drawn in favor of the non-moving party.  *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact.  *Adams v. Dep't of Juvenile Justice of City of New York*, 143 F.3d 61, 65 (2d Cir. 1998).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  Because "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact," *Kerzer*, 156 F.3d at 400, the non-moving party cannot survive a properly supported motion for summary judgment by resting on the pleadings "without offering 'any significant probative evidence tending to support the complaint.'" *Anderson*, 477 U.S. at 249 (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)).

B.  *42 U.S.C. § 1983*

42 U.S.C. § 1983 imposes civil liability on any party who, "under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution" of the

United States. *K & A Radiologic Tech. Servs., Inc. v. Comm'r of Dep't of Health of State of New York*, 189 F.3d 273, 280 (2d Cir. 1999) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)).  Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).  The "core purpose of § 1983 is 'to provide compensatory relief to those deprived of their federal rights by state actors.'" *Hardy v. New York City Health and Hosps. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999) (quoting *Felder v. Casey*, 487 U.S. 131, 141 (1988)).

      1.  *False Arrest*

      Claims brought under § 1983 are guided by the tort law of the forum state.  *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995).  Thus, "[a] § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted).  The elements of a false arrest claim under New York law are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer*, 63 F.3d at 118 (alteration in original, internal quotation omitted).  If probable cause existed the arrest is considered privileged and "is a complete defense to an action for false arrest whether that action is brought under state law or under § 1983." *Weyant*, 101 F.3d at 852 (internal quotation and citation omitted); *see also Singer*, 63 F.3d at 118-19 ("There

can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").

"Probable cause to arrest exists 'when the [arresting officers] have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested.'" *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir.1987) (quoting *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1983)) (alteration added). In determining whether probable cause existed, a court must consider "the facts available to the officer at the time of the arrest," *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997), and examine the totality of the circumstances. *See*, *e.g.*, *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

"An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119. Of course, some purported victims of crimes may have axes to grind, and certain preexisting relationships between the victim and the accused can raise doubts as to the victim's veracity. *See Mistretta v. Prokesch*, 5 F.Supp.2d 128, 133 (E.D.N.Y. 1998); *see generally* 2 Wayne A. LaFave, *Search and Seizure* § 3.4(a) (5th ed. 2012) (hereinafter "LaFave"). When this type of prior relationship exists and is known to the arresting officer before the arrest is made, the complaint alone may not establish probable cause, and further investigation may be necessary before a lawful arrest can be carried out. *See Mistretta*, 5 F.Supp.2d at 133; 2 LaFave, *supra*, § 3.4(a); ("'In those cases observed where the police knew or

became aware of such a prior relationship, they were hesitant to act without further investigation.'" (quoting Wayne A. La Fave, Arrest 277-78 (1965))).

### 2.  *Malicious Prosecution*

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law."  *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations omitted); *see also Sankar v. City of New York,* 867 F. Supp. 2d 297, 309 (E.D.N.Y. 2012).  The elements of a malicious prosecution claim under New York law are: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice motivating defendant's actions.  *See Manganiello*, 612 F.3d at 160.

### 3.  *Qualified Immunity*

 "[Q]ualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known."  *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 568-69 (2d Cir. 1996).

> Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was "arguable probable cause" to arrest.  Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."

*Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).

C.  *Claims based on the December 14, 2009, Arrest*

1.  *Claims Against Dameron*

Viewing the facts in the light most favorable to Morris, I find that she was arrested in her apartment when she alleges Silvestre told her that if she did not accompany him to the precinct she would be arrested.  Ex. 3 at 49:1-2 (Morris Dep.); *see California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("An arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority.") (emphasis omitted).  While it is undisputed that Dameron was not present at the apartment, he was a key participant in her arrest.  Dameron received the complaint from Dave Miller and, believing the complaint established probable cause, set the wheels in motion for Morris's arrest later that day.  *See* Ex. 5 at 14:13-16 (Dameron Dep.) ("Q: I'm saying you received a complaint, you had probable cause.  What would be the next step after that?  A: To arrest [Morris].");  Pl. Rule 56.1 Stmt. ¶ 9.

It is undisputed that on the morning of December 14, 2009, Dave Miller told Dameron that Morris had unauthorized possession of Osborne Miller's bank card and had used it to make unlawful withdrawals from the associated account, an account on which Dave Miller claimed to be the only other authorized user.  Ex. 5 at 8:9-10:16 (Dameron Dep.).  The facts provided by Dave Miller to Dameron established each of the elements of Criminal Possession of Stolen Property, and Morris has not presented sufficient evidence to show that Dameron had reason to doubt Dave Miller's veracity.  Those who claim to be eyewitnesses or victims of crimes are among the most trustworthy sources of information since they can usually provide a first-hand, nonhearsay account of the criminal activity.  *See Curley v. Vill. of Suffern*, 268 F.3d 65, 69-70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubt as to the person's

veracity.") (internal citation omitted); *see also Miloslavsky v. AES Eng'g Soc., Inc.*, 808 F.Supp. 351, 355 (S.D.N.Y. 1992) *aff'd*, 993 F.2d 1534 (2d Cir. 1993) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth.").

Morris further alleges that Dameron did not sufficiently investigate the accusations made against her before arresting her.  However, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti*, 124 F.3d at 128; *see also Curley*, 268 F.3d at 70 ("[T]he arresting officer does not have to prove plaintiff's version wrong before arresting him.").  Indeed, probable cause requires only a probability, or a "substantial chance" of criminal activity, not an actual showing of criminal activity.  *Illinois v. Gates,* 462 U .S. 213, 244 n.13 (1983).  The police are neither required nor equipped to adjudicate whether criminal conduct has actually occurred.  Instead, they are tasked with determining whether probable cause exists to believe a particular person committed a particular crime.  *See Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) ("Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence.").

The nature of the relationship between Dave Miller and Morris, which was known to Dameron before the arrest, makes the question of whether probable cause existed a close one. A son accusing his father's live-in girlfriend of stealing money from his dying father is the sort of preexisting relationship between an accuser and an accused that presents a clear motive for a

false accusation and could cast doubt on the veracity of the complaint.  *See Mistretta*, 5

F.Supp.2d at 133.  On the other hand, there are facts here that tend to support Dave Miller's

veracity and the existence of probable cause.  First of all, instead of simply calling the police

with an accusation against Morris, Dave Miller went personally to the precinct to lodge a formal

complaint.  He presented Dameron with the bank card in question, which constituted physical

evidence of the crime.  *See Singer*, 63 F.3d at 119.  He told Dameron that he had found the card

that same day in Morris's purse.  In addition, when Silvestre and the officers under his command

arrived at the apartment several hours after Dave Miller had lodged the initial complaint, both

Miller brothers were "adamant" that Morris had made unauthorized withdrawals using Osborne

Miller's bank card.  Ex. 4 at 18:6-9 (Silvestre Dep.).  Finally, when the arresting officers

observed Osborne Miller incapacitated in a hospital bed at the apartment before Morris was

arrested, part of Dave Miller's complaint was corroborated, further supporting the veracity of his

accusation against Morris.  *See Panetta v. Crowley*, 460 F.3d 388, 397 (2d Cir. 2006)

(corroboration of complaint provides indicia of reliability); Ex. 3 at 51:4-7 (Morris Dep.)

(hospital bed was visible to Silvestre when he entered the apartment).  In sum, viewing the facts

in the light most favorable to Morris, I conclude as a matter of law that there was probable cause

to arrest her on December 14, 2009 for criminal possession of stolen property (Osborne Miller's

bank card) even before she was taken to the precinct.

   Even if Dave Miller's complaint did not give rise to probable cause to arrest

Morris, at the very least the events established arguable probable cause.  *See Cerrone v. Brown*,

246 F.3d 194, 203 (2d Cir. 2001) ("[T]he court must grant police officers qualified immunity

when the court concludes that the only conclusion a reasonable jury could reach is that

reasonable officers would disagree on the constitutionality of the seizure.").  Having concluded

that probable cause existed, it follows that I further conclude that, at the very least, reasonable officers could disagree as to whether there was probable cause to arrest. Accordingly, defendants' motion for summary judgment on Morris's false arrest claim against Dameron is granted on the additional ground of qualified immunity.

Morris's malicious prosecution claim against Dameron is also foreclosed by the existence of probable cause. *See*, *e.g.*, *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir. 2003) ("[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York."). And again, even if probable cause was absent at the initiation of criminal proceedings, Morris's claim of malicious prosecution would fail because Dameron at least had arguable probable cause, which provides him with qualified immunity. *See Anderson v. Creighton*, 483 U.S. 635, 641, (1987) ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.").

2. *Claims Against Silvestre*

Morris claims that Silvestre subjected her to a false arrest and an illegal search.[5] As discussed above, there is a significant factual dispute regarding the actions of the police while in the apartment. According to Morris, Silvestre both arrested her in the apartment and subjected her and her bedroom to an illegal search before they left for the precinct. Ex. 3 at 50:10, 51:23-52:3 (Morris Dep.). For his part, Silvestre contends that Morris was not arrested at the apartment

---

[5]        It was made clear at oral argument that no *Payton* claim is being advanced by Morris, who I conclude for the purposes of the defendants' motion was arrested in her home. *See Payton v. New York*, 445 U.S. 573, 576 (1980) (Ordinarily, police are prohibited "from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest."). Even if a *Payton* claim were asserted, there is undisputed evidence that the officers were invited into the apartment. *See* Ex. 3 at 46:19-48:1 (Morris Dep.). As such, a *Payton* claim would fail.

because she voluntarily accompanied the police to the precinct.  Furthermore, Silvestre contends, her bedroom was not only not subjected to a search, but he actually *prevented* Osborne Miller's sons from conducting any search for the mailbox key they were looking for.   Ex. 4 at 18:11-19:15 (Silvestre Dep.).

As for Morris's motion, when the facts are viewed in the light most favorable to Silvestre, there was neither an arrest nor a search by him, and thus her motion on the false arrest claim is denied.

As for Silvetre's motion, I conclude for the reasons discussed above that even if he placed Morris under arrest at the apartment, that arrest was supported by probable cause.  For that reason and the additional reason of qualified immunity, which is also discussed above with respect to Dameron, Silvestre's motion for summary judgment on Morris's false arrest claim is granted.

Morris's claim that she was subjected to an illegal search is more nuanced.  The probable cause to arrest supported a search of Morris herself and of the areas within her reach at the time of arrest.  The rationale for such a search "incident to arrest" is to disarm the suspect and to "preserve evidence on his person for later use at trial." *United States v. Robinson*, 414 U.S. 218, 234 (1973).  Accordingly, the scope of such a search is limited to "the arrestee's person and the area within his immediate control . . . the area from within which he might gain possession of a weapon or destructible evidence." *United States v. Gandia*, 424 F.3d 255, 261 (2d Cir. 2005) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)) (internal quotation omitted).  To the extent Morris complains that she (or any place she could reach) was searched, the defendants' motion is granted.

However, Morris alleges that Silvestre searched more than just the area of the bedroom within her reach.  Specifically, she testified at her deposition that two or three officers led by Silvestre "entered into the bedroom and they were searching around the bedroom . . . ." Ex. 3 at 48:11-12.  Silvestre's argument that this claim should be dismissed because Morris has not sufficiently alleged that he personally participated in the search is unavailing.  Morris stated that either Silvestre or another officer searched the bedroom for a key before she was taken to the precinct.  *See* Ex. 3 at 50:7-12 (Morris dep.) ("Q: You had said either Sergeant Sylvestri or another officer searched the apartment?  A: They searched the bedroom."); *see also id.* at 51 ("Q: Did Sergeant Silvestri recover anything from the bedroom?  A: I don't know.").  And Silvestre testified that he was the supervising officer on the scene.  Viewing these facts in the light most favorable to Morris, a genuine issue of material fact exists regarding whether Silvestre or officers under his on-site supervision conducted an unlawful search of the bedroom that was both warrantless and beyond the bounds of the permissible search incident to arrest that was authorized.  As a result, defendants' motion for summary judgment on this particular dimension of the illegal search claim is denied.[6]

D.  *Claims Based on the December 28, 2009, Arrest*

Morris claims that she was subjected to a false arrest by Officers Graziano and Jordan on December 28, 2009, in violation of § 1983.  There is no dispute regarding any material facts surrounding this arrest or the knowledge of the officers at the time the arrest was made.  Thus, the question whether probable cause existed may be determined as a matter of law. *Weyant*, 101 F.3d at 852.  Because I find that the arresting officers had probable cause to arrest

---

[6]      I do not consider the facts here to raise a legal issue of supervisory liability, but rather a question of whether Silvestre is liable for his direct participation in the alleged constitutional injury.  *See Turkmen v. Ashcroft*, 915 F.Supp.2d 314, 333-334 (E.D.N.Y. 2013) (describing difference between direct and supervisory liability).

Morris for contempt of a court order, defendants' motion for summary judgment on this claim is granted.

It is undisputed that Morris refused to comply with a court order issued by a Queens County Housing Court that granted, *inter alia*, Dave and Eric Miller "unrestricted access to the apartment as representatives of the estate of Osborne Miller," Ex. G (Housing Court Order); Ex. 3 at 71:11-21 (Morris Dep.) ("[W]hen [Dave and Eric Miller] came . . . I would never let them in."). Graziano and Jordan arrived at the apartment based on a complaint made by Dave and Eric Miller that Morris would not allow them access into the premises. Pl. Rule 56.1 Stmt. ¶ 46; Ex. 21 (12/28/2009 Arrest Report). The officers showed the court order to Morris, explained that she was in violation of the order by not allowing the Miller brothers access to the apartment and asked Morris to allow them to enter. Ex. 3 at 69:1-10 (Morris Dep.). When Morris again refused to comply with the court order the officers arrested her for Criminal Contempt in the Second Degree in violation of N.Y. Penal Law § 215.50(3). Second Am. Compl. ¶ 29; Ex. 21 (12/28/2009 Arrest Report).

Penal Law § 215.50(3) prohibits "[i]ntentional disobedience or resistance to the lawful process or other mandate of a court except in cases involving or growing out of labor disputes . . . ." N.Y. Penal Law § 215.50(3) (McKinney). Morris argues that the violation of the court order was not sufficient to create probable cause to arrest her because the order did not contain an arrest clause and, in addition, was too vague to support a charge. Pl. Br. in Opposition 22. These arguments are without merit. First, the plain language of § 215.50(3), which is written broadly to criminalize disobedience to "lawful process or other mandate of a court," indicates that an arrest clause in a violated court order is unnecessary to provide probable cause for arrest under this statute. This interpretation is confirmed by the decisions of other

17

courts applying § 215.50(3), which have not required an arrest clause in the court orders that were violated.  *See*, *e.g.*, *Rheingold v. Harrison Town Police Dep't*, 568 F.Supp.2d 384, 390 (S.D.N.Y. 2008) ("Under New York law, a person is guilty of criminal contempt in the second degree when he wilfully disobeys a clear and definite court order."); *Holtzman v. Beatty*, 468 N.Y.S.2d 905, 907 (N.Y. App. Div. 1983) ("'In order to sustain a conviction for criminal contempt for violation of a court's order the court's order must be specific and the violator must be aware of such an order.'") (quoting *Matter of Rumaker,* 646 F.2d 870, 872 (5th Cir.1980)). Second, despite Morris's unsupported and conclusory allegation to the contrary, I see nothing vague in the court order, which grants Dave and Eric Miller "unrestricted access to the apartment as representatives of the estate of Osborne Morris."  Ex. G (Housing Court Order).  Furthermore, as was the case with regard to Morris's claims of false arrest stemming from her December 14, 2009, arrest, even if there was not probable cause for her arrest on December 28, there was at least arguable probable cause, which entitles Graziano and Jordan to qualified immunity.  *See Escalera v. Lunn,* 361 F.3d at 743.

E.  Monell *Claims Against the City of New York*

In *Monell v. Dep't of Social Servs.*, the Supreme Court held that in certain instances a municipality may be held liable for the tortious conduct of its employees.  436 U.S. 658 (1977).  However, "governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988); *see also Bd. Of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("A municipality may not be held liable . . . solely because it employs a tortfeasor.").  In sum, "[e]stablishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in

18

addition, that their commission of the tort resulted from a custom or policy of the municipality." *Askins v. Doe No. 1*, 727 F.3d 248 (2d Cir. 2013).

Morris claims that the City is liable for injuries stemming from her arrests on December 14 and 28, 2009, based on a failure to train and a failure to supervise, in violation of § 1983.  Second Am. Compl. ¶ 50-63.  She alleges that "[t]he City here maintained a custom that allows officers to unconstitutionally arrest persons like the plaintiff without probable cause," and "also does not have an effective training and retraining program to inculcate into the police officers the need not to commit constitutional breaches of rights of citizens in the course of their employment."  Pl. Br. at 27; Second Am. Compl. ¶ 60 ("The City has been alerted to the regular used [sic] of false arrests by its police officers, but has nevertheless exhibited deliberate indifference to such false arrests . . . .").  In support of these allegations, Morris points to a civil suit against defendant Dameron and other officers that settled with an undisclosed monetary payout to the plaintiff, an unrelated civil suit brought against Jordan that also settled, and another settled civil suit against a non-defendant supervising officer.  Pl. Br. at 28.

Even assuming that Morris did suffer a constitutional injury on December 14 or December 28, 2009, her *Monell* claim against the City must fail because she does not produce any evidence to show a policy or custom of the City that caused her alleged injuries.  "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."  *Monell*, 436 U.S. at 694. Morris's claims amount to assertions that the officers who arrested her made incorrect, on-the-spot judgments that their actions were supported by the facts available to them.  Even if she were correct in those assertions, there are no facts from which a reasonable jury could find that those

incorrect judgments were the result of a municipal policy or custom.  For this reason, Morris's

argument for the City's liability based on a theory of vicarious liability must fail.  *Connick v.*

*Thompson*, 131 S. Ct. 1350, 1359 (2011) ("[Municipalities] are not vicariously liable under §

1983 for their employees' actions.").

    Morris has only provided conclusory allegations that the conduct she complains

of was the result of a custom or policy of the City.  *See Dwares v. City of New York*, 985 F.2d 94,

100 (2d Cir. 1993) ("The mere assertion . . . that a municipality has such a custom or policy is

insufficient in the absence of allegations of fact tending to support, at least circumstantially, such

an inference."), *overruled on other grounds*, *Leatherman v. Tarrant County Narcotics*

*Intelligence & Coordination Unit,* 507 U.S. 163 (1993).  The fact that two of the defendants as

well as a non-defendant supervising officer have had civil suits brought against them in the past

that resulted in settlements is not even evidence of wrongdoing, let alone that the City has a

custom or policy that fosters or results in wrongdoing.  Similarly, the claims of false arrest and

malicious prosecution alleged in Morris's complaint, even if true, do not constitute sufficient

evidence of a custom or policy to support a *Monell* claim.  *See Ricciuti*, 941 F.2d at 123 ("[A]

single incident alleged in a complaint, especially if it involved only actors below the policy-

making level, does not suffice to show a municipal policy.").  Thus, the lack of any evidence of a

municipal custom or policy necessitates granting defendants' motion for summary judgment on

Morris's *Monell* claim against the City.

CONCLUSION

    For the reasons stated above, defendants' motion for summary judgment is

granted on all claims except the illegal search claim against Silvestre.  Jury selection and trial of

20

that claim will commence at 9:30 a.m. on January 13, 2014.  A final pretrial conference will be held on January 6, 2014, at 11:00 a.m.  Plaintiff's cross-motion for summary judgment is denied.

So ordered.


John Gleeson, U.S.D.J.


Dated: October 28, 2013
       Brooklyn, New York